IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALAN K. VAN ORDEN, Personal Representative of the Estate of Crystal Rhea Bannister, ROBERT BANNISTER, as a parent and legal heir of Chrystal R. Bannister, and MICHELLE WALESKE, as a parent and legal heir of Crystal R. Bannister,<br><br>                Plaintiffs,<br>  v.<br><br>CARIBOU COUNTY; CARIBOU COUNTY SHERIFF'S DEPARTMENT, an Office Controlled and Directed by Caribou County; RIC L. ANDERSON, in his individual capacity and in his official capacity as Sheriff of Caribou County; MICHAEL HADERLIE, in his individual capacity and in his official capacity as Commander of the Caribou County Jail; BROCK LOPEZ, in his individual capacity and in his official capacity as Detention Sergeant of the Caribou County Jail; HEATH S. DOWNS, an individual; BRANDY BREDEHOFT, an individual; JUDY PROBART LONG, an individual; JODI SUTER, an individual; BRETT SMITH, an individual; and John Does 1 through 10,<br><br>                Defendants. | Case No. 4:10-cv-00385-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

      The Court has before it four motions: (1) Plaintiff's Motion for Summary

Judgment on Defendants' Affirmative Defenses (Dkt. 86); (2) Defendant Brett Smith's

Motion for Summary Judgment (Dkt. 88); (3) the County Defendants' Motion for Summary Judgment (Dkt. 93); and Defendants' Motion to Strike (Dkts. 145) certain exhibits offered by Plaintiffs.  The Court has read and thoroughly considered the briefing and relevant attachments, and heard oral argument on May 30, 2012.  As more fully expressed below, the Court will grant summary judgment to Defendants, and deny as moot Plaintiffs' motion for summary judgment and Defendants' motion to strike.

## BACKGROUND

On August 22, 2009, Chrystal Rhea Bannister attempted suicide by overdosing on prescription medications.  Bannister called 911 and was transported to Bear Lake Memorial Hospital, in Montpelier, Idaho.  On the morning of August 25, 2009, Trevor Robinson, MD, and mental health professional Shaun Tobler discharged Bannister subject to a treatment plan.  That plan included prescription medications and mental-health appointments.  *See Pl. Stat. of Facts*, Dkt. 134 at 2.

Just before leaving the hospital, Bannister took a dose of methadone, provided by Dr. Robinson until Bannister could get her prescription filled.  *Med. Admin. Rec.*, Dkt. 96-7.  Soon after her discharge, Bannister was arrested for attempting to alter her methadone prescription.  *Officer Wells Report*, Dkt. 96-8 at 6-7.  Because Bear Lake County lacks a jail facility, it contracts with Caribou County to house its detainees.  Accordingly, Bannister was transported to Soda Springs by Officers Wells and Knutti, where she was booked into Caribou County Jail.  *Id.*  Officer Knutti informed Deputy Brandy Bredehoft and dispatcher Jodi Suter, who were on duty at the jail, that Bannister

had attempted suicide on August 22, and had just been released from the hospital because of that suicide attempt. *Pl. Stat. of Facts*, Dkt. 134 at 2-3.

Because of the report received from Officer Knutti, Bredehoft requested confirmation from Dr. Robinson that Bannister could safely be incarcerated. In response to that request, she received a fax from Dr. Robinson, which noted that Bannister had been released from the hospital as "mentally and medically stable." *Robinson Fax*, Dkt. 105 at 55-57. Dr. Robinson's fax recommended three medications for Bannister, including Methadone, to prevent withdrawal. *Id.* Bredehoft determined that Bannister should be "medically segregated," given her possible withdrawal. According to Bredehoft, "medical segregation" includes monitoring, although no written policy specifies a monitoring frequency. *Bredehoft Dep.* 77:21 – 78:21, Dkt. 105 at 77-78. "Suicide watch," which Bredehoft did not call for, requires checks every 15 minutes. *Id.*

According to Bredehoft and Deputy Heath Downs, whose shift followed Bredehoft's, when an inmate needs a prescription filled, standard operating procedure is to contact the jail's contracted physician's assistant, Defendant Brett Smith. *Bredehoft Dep.* 128:7-130:9, Dkt. 93-6 at 6-7; *Downs Dep.* 122:16-18, Dkt. 93-7 at 20. Smith testified at deposition that jail personnel did not need his assistance in filling routine prescriptions. *Smith Dep.* 274:14-24, 310:2-5, Dkt. 96-1 at 90, 93. However, Methadone for withdrawal – as opposed to pain – must be prescribed by those with a special license in Idaho; Smith did not believe that Dr. Robinson had such authority. *Smith Dep.* 215:13-218:18, 233:5-234:25, Dkt. 96-1 at 54-55, 71-72.

Bredehoft contacted Smith the afternoon of August 25, and had several phone conversations about obtaining Bannister's medications. Smith also spoke briefly with Bannister. *Def. Smith Stat. of Facts*, Dkt. 90 at 5-6. Ultimately, Smith told Bredehoft he would work on obtaining the Methadone, and be back in touch. *Smith Dep.* 233:5-234:25, Dkt. 96-1 at 71-72. After trying unsuccessfully to reach Bannister's usual doctor, Smith was able to secure a few doses of Methadone through a licensed supervising physician, until Bannister could fill her prescription. *Smith Dep.* 30:20-31:19, Dkt. 96-1 at 9-10. The Methadone was ready for a deputy to pick-up at the hospital pharmacy that evening. *Id.* 313:18-20, Dkt. 96-1 at 96; 180:1-181:9, Dkt. 96-1 at 38-39.

During her time at the jail, Bannister became increasingly agitated. She demanded her medications, particularly Methadone, and to be taken to a hospital or to see a care provider. At least once, Bannister kicked the door of her cell to get the jail staff's attention. *Pl. Stat. of Facts*, Dkt. 134 at 5. Downs told Bannister the jail was working on getting the Methadone, and that she would need to be patient. Downs allowed Bannister to make two phone calls, and offered to put her in the general population where she would have distractions such as television. Bannister declined. *Downs Incident Narrative*, Dkt.111 at 2-3.

Dispatcher Judy Long relieved Suter as dispatcher around 7:00 p.m. that day. Long warned Bannister not to use the intercom except for emergencies, or else her intercom access would be cut off. *Long Narrative*, Dkt. 111 at 11.

Bannister's cell was near the booking area which was continuously monitored by video which was displayed in the dispatch area. The dispatcher on duty was to check the

MEMORANDUM DECISION AND ORDER — 4

monitor and respond to inmates over the intercom. *Long Dep.* 50:10-14, Dkt. 93-8 at 7. Long failed to check the monitor for about an hour and 15 minutes, during which Bannister hanged herself. *Pl. Stat. of Facts*, Dkt. 134 at 10. Downs discovered Bannister hanging, alerted Long by intercom, and began CPR. By that time, Bannister had been dead between twenty and thirty minutes. *Id.* at 6-7.

Plaintiffs – Bannister's parents and the personal representative of her estate, have sued Caribou County, the Caribou County Sheriff's Department, dispatchers Suter and Long, Deputies Bredehoft and Downs, and PA Smith, among other County Defendants. The suit asserts negligence, and constitutional violations under 42 U.S.C. § 1983. Plaintiffs, the County Defendants, and Defendant Smith have each moved for summary judgment.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary

judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1. State Law Negligence Claims

In their briefing, Plaintiffs dropped their negligence claim against Defendant Smith (Dkt. 138 at 16). At oral argument, Plaintiffs seemed to concede that all state law negligence claims – including those against the County Defendants – are precluded under Idaho law. In Idaho, state law negligence claims do not survive the injured person's death. I.C. § 5-327(2); *Evans v. Twin Falls County*, 796 P.2d 87, 94-95 (1990); *Hayward v. Valley Vista Care Corp.*, 33 P.3d 816, 825 n.2 (2001). Accordingly, the Court will grant the County Defendants' motion for summary judgment on the state law negligence claims. Given dismissal of those claims, the Court need not consider application of the Idaho Tort Claims Act or any related issues raised by Defendants.

### 2. Deliberate Indifference and § 1983

The general requirements of a § 1983 claim are (1) a deprivation of the claimant's constitutionally-protected right, privilege, or immunity, by (2) a person acting under color of state law. *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988). Here, Plaintiffs allege deprivation of due process under the Fourteenth Amendment, regarding serious medical needs. The due process clause imposes the same duty as under the Eighth Amendment – that officials not be deliberately indifferent to serious medical needs of persons in custody. *Gibson v. Cy of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002).

To state a claim of deliberate indifference, a plaintiff must allege that the defendant knew of a serious medical need, and disregarded it by failing to adequately respond. *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017-18 (2010). Under this standard, plaintiff must establish both an objective and a subjective requirement. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).

### A. Objective Requirement

To satisfy the objective requirement, plaintiff must show a serious medical need or "substantial risk of serious harm." *Clouthier v. Cy of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010). Here, Plaintiffs suggest a broad scope of serious medical needs that fall into two categories: drug withdrawal and mental health issues.

As to withdrawal, Plaintiffs acknowledged at oral argument that Bannister was not due for a dose of Methadone until, at earliest, 7:00 p.m. on August 25, 2009 – within an hour of Bannister's death. According to the record, there was – at most – an hour during which Bannister went un-medicated for withdrawal. Smith, who spoke with Bannister by phone during the day, observed that she spoke very clearly, with no signs of agitation, and "was not demonstrating any symptoms of withdrawal." *Smith Dep.* at 253, Dkt. 96-1 at 79. Thus, the undisputed evidence does not support that Bannister was at "substantial risk of serious harm" from withdrawal that day. *See Conn. v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010).

Regarding Bannister's mental health issues, the record – viewed with the benefit of hindsight – establishes that there was a substantial risk of serious harm or a serious medical need. In the Ninth Circuit, it is well-settled that a heightened suicide risk can

MEMORANDUM DECISION AND ORDER — 8

present a serious medical need. *City of Reno*, 591 F.3d at 1096. Given Bannister's suicide, the Court finds that the objective requirement for a deliberate indifference claim is satisfied.

### B. Subjective Requirement

For the subjective requirement, plaintiff must show both that defendant was aware of facts from which one could infer a substantial risk of serious harm, and also that defendant actually drew that inference. *Simmons*, 609 F.3d at 1017-18 (internal citations omitted). "Deliberate indifference is a high legal standard." *Toguchi*, 391 F.3d at 1060. Where a defendant should have been aware of a risk, but was not, there is no violation. *Gibson*, 290 F.3d at 1188. A mere showing that a defendant acted "imprudently, wrongly, or negligently," is insufficient. *Simmons*, 609 F.3d at 1020. Also, delay in providing medical treatment, by itself, does not amount to deliberate indifference. *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989) (citation omitted).

The Court now examines the subjective component of Plaintiffs' deliberate indifference claim against each of the Defendants.

### (1) Brett Smith, PA

In order to find Smith deliberately indifferent, the record, viewed in a light most favorable to the Plaintiff, must be sufficient to support a finding that Smith's actions or inaction in securing Bannister's medication were in knowing disregard of her serious mental health needs. The record, so viewed, does not support such a finding.

It is undisputed that Bannister had been hospitalized following a suicide attempt, three days before she was booked into Caribou County Jail, and that all Defendants –

including Smith – were aware of this. It is also agreed that all Defendants were aware that Dr. Robinson and mental health professional Shaun Tobler had treated and released Bannister from the hospital that morning, as medically and mentally stable. Finally, there is no dispute that Bannister had taken a Methadone dose prior to her release from the hospital, and was due for another dose between 7:00 and 8:00 that evening. *Med. Admin. Rec.*, Ex. G to *Hemmer Aff.*, Dkt. 96-7. Smith learned these details from Deputies Bredehoft and Downs, and in his own conversations with Bannister. *Smith Dep.* 224-32, Ex. A to *Hemmer Aff.*, Dkt. 96-1 at 62-70.

Smith was aware that Dr. Robinson had prescribed anti-anxiety medications and Methadone for Bannister. *Smith Dep.* at 265, Dkt. 96-1 at 84. However, Smith understood that jail personnel needed him to obtain only the Methadone, which requires a special license where – as here – it is for withdrawal rather than pain. *Id.* at 227-33, Dkt. 96-1 at 65-71. Smith believed that Robinson did not have that license. *Id.* at 233, Dkt. 96-1 at 71. As to the other medications Dr. Robinson had prescribed for Bannister, Smith believed the jail could get them without his help. *Id.* at 266, Dkt. 96-1 at 85.

Smith told Deputy Bredehoft that he would work on obtaining Bannister's Methadone, and then took steps to secure it. These steps included trying to reach Bannister's usual medical provider, getting Bannister's prescription filled through his supervising physician, and leaving messages with the jail asking that a deputy pick up the Methadone at the hospital pharmacy that evening. *Id.* at 161, 171-81, 200. Plaintiffs do not challenge these facts.

Instead, Plaintiffs argue that Smith "failed to provide [Bannister] her prescribed medications" in a timely fashion. *Pl. Statement of Facts*, Dkt. 134 at 11. The relevant issue is not whether Smith acted quickly enough to prevent Bannister's suicide, as implied in Plaintiffs' argument. To satisfy the subjective component of deliberate indifference claim, Plaintiffs must show (1) Smith believed that time was of the essence in addressing Bannister's medical needs, and (2) despite that knowledge he chose to delay action in obtaining her methadone prescription. The record simply does not support either required showing.

Bannister had received a methadone dose that morning and was not due for another until sometime between 7 and 8 p.m. Bannister hanged herself shortly before 8 p.m. Thus, at the time of her death, Bannister was due to receive another dosage of methadone. But, importantly, she was not *past due* for her next dose. Nothing in the record indicates that Smith believed Bannister needed to receive her Methadone earlier than prescribed. *See Smith Dep.* at 240, Dkt. 96-1 at 73 (Smith testified at deposition, "nothing had been conveyed to me that there was an urgency to get some medicine over to her right away.")

Plaintiffs have identified no evidence that Smith knew and disregarded a risk of harm. To the contrary, the record supports that Smith's actions were wholly appropriate. As stated above, the Court need not "comb through the record" for a reason to deny summary judgment." *Carmen,* 237 F.3d at 1029 (citations omitted). Plaintiffs have failed to meet their burden of directing the Court's attention to "specific triable facts."

*Southern California Gas Co.*, 336 F.3d at 889.  For these reasons, the Court will grant Smith's Motion for Summary Judgment, and dismiss all claims against him.

### (2)   Sheriff Anderson, Chief Deputy Haderlie, and Deputy Lopez

Defendants Sheriff Anderson, Chief Deputy Haderlie, and Deputy Lopez assert that they did not interact with Bannister while she was in custody at Caribou County Jail, or any time otherwise relevant to this case.  Also, none of these Defendants made decisions concerning Bannister's care.  The Plaintiffs have not identified any evidence in the record which suggests otherwise.  Because there is no evidence to support that these Defendants acted with deliberate indifference to Bannister, the Court will grant Defendants' Motion for Summary Judgment.  All claims against Defendants Anderson, Haderlie, and Lopez will be dismissed.

### (3)   Deputies Bredehoft and Downs, and Dispatcher Jodi Suter

Plaintiffs argue that Defendants Bredehoft, Downs, and Suter were aware of Bannister's suicide risk and ongoing mental health issues.  Indeed, the record does suggest that the jail's staff knew enough about Bannister's mental state to be concerned. For example, they knew that (1) Bannister had been hospitalized for being suicidal; (2) she had been suicidal in the past; (3) Deputy Knutti, who transported Bannister to the jail, was concerned about her mental state but did not know whether she should be on a suicide watch; (4) Bannister had been prescribed methadone and was arrested for altering the prescription; (5) Smith indicated that Bannister would have problems if she did not get her medications, (6) Bannister had recently broken up with a boyfriend; (7) this was her first time in jail, and (8) she was visibly upset and tearful.  These facts, standing

MEMORANDUM DECISION AND ORDER — 12

alone, would normally constitute sufficient, even powerful, circumstantial evidence that the jail staff was subjectively aware of Bannister's suicidal state and chose to ignore it. However, this view of the facts ignores the most compelling evidence concerning the jail staff's subjective understanding of Bannister's mental state.

The record indicates that the jail staff was properly concerned about Bannister's mental state. Plaintiffs concede that the jail staff requested and received a fax from Dr. Robinson after Bannister had been through booking, and after Bredehoft had spoken with Deputies Wells and Knutti. *Robinson Fax*, Ex. 4 to *Bailey Aff.*, Dkt. 105; *Bredehoft Dep.* at 186-213, Ex. D to *Castleton Aff.*, Dkt. 93-6 at 12-17. The fax unequivocally indicates that Bannister had been "medically cleared when released from the hospital," that she had been evaluated by a mental health care professional and "found to be medically and mentally stable," and that if she were incarcerated, Dr. Robinson would recommend Methadone, Xanax and Lexapro to avoid withdrawal symptoms. Notably, Dr. Robinson recommended the medications, not because of Bannister's mental state or because she was suicidal, but to ease her withdrawal symptoms.

No matter how Plaintiffs might interpret the fax, it poses an insurmountable barrier to their efforts to show that the jail staff was aware that Bannister was suicidal, and therefore at substantial risk of serious harm. Indeed, an indication from Dr. Robinson that Bannister had been evaluated by a mental health care professional and found to be "medically and mentally stable" is completely antithetical to any suggestion she was suicidal. Simply stated, no reasonable jury could conclude that Bredehoft, Downs or Suter had a subjective belief and understanding that Bannister was at

MEMORANDUM DECISION AND ORDER — 13

substantial risk of serious harm due to her being mental state, in the face of a treating physician's written note to the contrary. Clearly, accepting a physician's assessment of a prisoner cannot constitute deliberate indifference to that prisoner's medical needs.

The undisputed evidence shows that Bredehoft, Downs, and Suter each acted as they believed was necessary to address Bannister's needs. Bredehoft testified that she requested the fax from Dr. Robinson because she was uncertain as to Bannister's mental state and would not detain her at the jail without a medical release. *Bredehoft Dep.* at 190, Dkt. 93-6 at 13. Bredehoft believed that Dr. Robinson's fax indicated that Bannister was stable from a mental health perspective, and okay to be incarcerated. This message was conveyed to Downs, Suter, and also Dispatcher Long.

Given the lack of any evidence suggesting that Defendants Bredehoft, Downs and Suter were subjectively aware that Bannister was at substantial risk of serious harm, the Court will grant summary judgment to those Defendants and Plaintiffs' deliberate indifference claims against them will be dismissed.

### (4) Dispatcher Long

The Court's analysis with respect to Bredehoft, Downs, and Suter largely applies to Dispatcher Long. However, additional facts concerning Long warrant further discussion. Long was the dispatcher on duty when Bannister committed suicide, and it is undisputed that she simply failed to observe the monitor for more than an hour during which the tragedy occurred. It is also undisputed that Long, responding to Bannister's repeated requests for drugs or hospital transport, directed Bannister to stay off the intercom unless she had an emergency. Finally, Long made remarks to another law

enforcement officer, after Bannister's suicide, referring to Bannister as a "bitch" who Long would like to "slug." *Long Call to Owens*, Ex. 40 to *Bailey Aff.*, Dkt. 113 at 84.

Defendants do not challenge that Long's failure to check the monitor was negligent. Similarly, there can be little dispute that Long's comments about Bannister after her death demonstrate – at best – horrible judgment, and at worst, a mean-spiritedness warranting personnel action. But, however reprehensible Long's inactions and statements, they do not indicate – nor is there otherwise any indication – that Long believed Bannister was at substantial risk of serious harm. Although she knew that Bannister had recently attempted suicide, Long – like Bredehoft, Downs and Suter – was informed that Dr. Robinson and Shaun Tobler had released Bannister from the hospital as medically and mentally stable.

The Ninth Circuit has made clear that deliberate indifference does not include mere negligence or poor judgment. *Simmons*, 609 F.3d at 1020. As Plaintiffs themselves note, Long stated – when interviewed about the suicide, "I just missed it all! . . . how the hell did I miss all that? . . . I screwed up." *Long Interview*, Ex. 15 to *Pl. Mem. for Summ. Jmt.*, Dkt. 87-15 at 4-5. There is no genuine issue of material fact whether Long's actions or inaction were the result of intent or awareness of Bannister's imminent suicide. The undisputed facts support that they were not. For these reasons, the Court will grant Defendant's motion for summary judgment, and dismiss claims against Long.

### C.    Plaintiffs' Familial Rights

The Fourteenth Amendment protects certain familial rights from wrongful government interference. *Kelson v. City of Springfield*, 767 F.2d 651 (9th Cir. 1985).

Plaintiffs claim that Defendants violated their constitutional right to their familial relationship with Bannister. However, this claim is premised on Plaintiffs' claim of deliberate indifference to Bannister, allegedly resulting in Bannister's death. Because the Court has found no deliberate indifference by Defendants Smith, Bredehoft, Downs, Suter, or Long, the Court will grant Defendants' motion for summary judgment on this claim. Plaintiffs' claim regarding deprivation of familial rights will be dismissed.

### D. Caribou County, Caribou County Sheriff's Department

Plaintiffs claim that a policy, custom, or practice of Caribou County and the Caribou County Sheriff's Department caused a deprivation of Bannister's and Plaintiffs' constitutional rights. *See Monell v. Dept. of Soc. Svcs. Of City of New York*, 436 U.S. 658, 691-94 (1978). Because the Court has found no deprivation of constitutional rights, the Court finds that Plaintiffs cannot succeed on this claim. Defendants' motion for summary judgment on this issue will be denied, and Plaintiffs' claim will be dismissed.

### 3. Plaintiffs' Motion to Dismiss Affirmative Defenses, and Defendants' Motion to Strike Are Moot

In light of the Court's findings granting summary judgment to Defendants, Plaintiffs' motion for summary judgment on Defendants' affirmative defenses will be denied as moot. The Court need not address whether Defendants' affirmative defense of qualified immunity applies, as also raised in Defendants' Motion. Also, the Court will deem moot Defendants' motion to strike portions of Plaintiffs' exhibits submitted to the Court.

## ORDER

**IT IS ORDERED THAT:**

1. Defendant's Motion to Strike (Dkt. 145) is **DENIED** as moot.

2. Defendant Brett Smith's Motion for Summary Judgment (Dkt. 88) is **GRANTED**.

3. Defendants' Motion for Summary Judgment (Dkt. 93) is **GRANTED** as to County Defendants.

4. Plaintiffs' Motion for Summary Judgment (Dkt. 86) is **DENIED**.

5. All claims against all Defendants shall be dismissed with prejudice.

DATED: June 8, 2012

B. Lynn Winmill
Chief Judge
United States District Court